Fleeta H. HALEY, and Allen Haley, Sr.,
Plaintiffs-Appellees,

v.

The UNITED STATES of America,
Defendant-Appellant.

No. 82–2008.

United States Court of Appeals,
Tenth Circuit.

Aug. 3, 1984.

Pamela A. Hornett, Atty., Washington, D.C. (J. Paul McGrath, Asst. Atty. Gen., Mark S. Feldheim, Asst. Director, Torts Branch, Dept. of Justice, Washington, D.C. and Francis Keating, U.S. Atty., Tulsa, Okl., with her on the brief), for defendant-appellant.

James Clinton Garland, Tulsa, Okl. (James E. Frasier, Tulsa, Okl., with him on the brief) of Frasier, Frasier & Gullekson, Tulsa, Okl., for plaintiffs-appellees.

Before BARRETT, DOYLE and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

The United States has appealed from a $190,000 judgment entered against it in a suit brought by Fleeta A. Haley and her husband Allen Haley for medical negligence under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680. The government contends that the trial court made several clearly erroneous findings of fact and erred in holding that at the time of the alleged injury Oklahoma recognized the doctrine of informed consent and that Oklahoma law required that Mrs. Haley be referred to a specialist in gastroenterology or advised of the availability of a gastroenterology specialist.

Mrs. Haley first learned that she had an intestinal disease in 1968 when Robert Hinkle, D.O., a surgeon at Oklahoma Osteopathic Hospital, performed an exploratory laparotomy. After viewing Mrs. Haley's intestinal tract during surgery, Dr. Hinkle informed her that she had Crohn's disease. Since 1969, Mrs. Haley has been a patient at the United States Public Health Service Indian Hospital in Claremore, Oklahoma. In 1973, because of unusual pain in her stomach, Mrs. Haley was sent to David W. Jenkins, M.D., a gastroenterologist. Dr. Jenkins referred her to J.D. Shipp, M.D., a surgeon at St. John's Hospital in Tulsa, Oklahoma, who removed an obstruction of her bowel. The operation involved removal of the total colon (large intestine) and the creation of an ileostomy, a channel through which the patient could discharge waste from her body.

On September 6, 1977, Mrs. Haley visited the Claremore hospital complaining of vomiting and abdominal cramps. A rectal biopsy disclosed an inflammation in the rectal stump. Joseph A. Bretza, M.D., a Claremore doctor who analyzed the biopsy, thought that Mrs. Haley might have ulcerative colitis but that regional enteritis (Crohn's disease) could not be ruled out. Dr. Bretza also thought that Mrs. Haley's rectal stump could be cancerous. Removal of the rectal stump was recommended to Mrs. Haley because of Dr. Bretza's diagnosis, her persistent mucous discharge, rectal bleeding, abdominal pain, and a pathological report by Mark Rauter, M.D., dated October 17, 1977. The report states, "A definite diagnosis of chronic ulcerative colitis cannot be made, however, there are suggestions of this process." The report concludes with a diagnosis of chronic ulcerative proctitis. A pathology report of October 26, 1977, states, "changes in the colon are compatible with chronic ulcerative colitis in quiescent phase."

On October 21, 1977, Charles Allen, M.D., the chief of surgery at Claremore, performed a history and physical. Although Mrs. Haley believed that Dr. Allen would perform the surgery, Dr. Allen arranged for Larry Hrdlicka, M.D., a doctor in private practice with surgical privileges at Claremore, to perform the surgery. No evidence was presented to the trial court to show that any of the physicians involved

consulted medical records and reports from previous surgeries performed on Mrs. Haley. The physicians did not consult with gastroenterology specialists concerning the ambiguity in the diagnosis of Mrs. Haley's condition. Dr. Hrdlicka, who performed the surgery on Mrs. Haley, testified that he would not have operated on Mrs. Haley if he had been aware of the diagnosis of Crohn's disease.

The trial court found that Dr. Allen did not discuss removal of Mrs. Haley's uterus during the October 21, 1977 visit, nor did Dr. Allen intend to remove the uterus. Although Dr. Allen informed Mrs. Haley that surgical removal of the rectal stump was elective, she thought the surgery was necessary because of the threat of cancer in the rectal stump. Mrs. Haley was admitted for surgery at the Claremore hospital on October 24, 1977. She signed the Request for Administration of Anesthesia and for Performance of Operation and Other Procedures two different times. On the first occasion, at 12:30 p.m. on October 24, a nurse, Ellen Parese, brought the form which Mrs. Haley signed to indicate that she understood the nature of the rectal surgery. Mrs. Haley signed the consent form for the second time on the morning of October 25, 1977. At 9:00 a.m. Mrs. Haley received her pre-operative medication. The record is unclear as to whether Mrs. Haley had received any medication prior to 8:00 a.m. on that day, but evidence was presented that she was awakened at 8:00 a.m. on October 25 to sign the consent form. At this time the hospital apparently wished to obtain Mrs. Haley's consent for a "possible hysterectomy." Mrs. Haley wrote "Remove my rectum and possible removal of uterus," as her understanding of the procedure, and signed her name, the date, and the time of 8:00 a.m. On the morning of October 25, 1977, Dr. Hrdlicka removed the rectal stump and uterus. Dr. Hrdlicka admitted that there was no disease in the uterus; he removed the uterus to expose the rectum and facilitate its removal. Dr. Hrdlicka testified that he explained to Mrs. Haley the evening before the surgery that such a procedure might be necessary to facilitate the surgery and that Mrs. Haley

told him that she did not want to have any more children. Mrs. Haley testified that she and her husband did wish to have more children and that she understood that the uterus would be removed only if Dr. Hrdlicka, or whoever performed the surgery, determined during surgery that it was diseased.

Subsequent to her surgery, Mrs. Haley developed both an abdominal wound infection and a perineal wound infection, which required incision and drainage. On October 26, 1977, the ileostomy bag leaked. Dr. Allen testified that cultures showed that the infection probably occurred at the time of surgery. He also testified that there was no way to prevent leakage following surgery.

In its Findings of Fact and Conclusions of Law the district court found that no evidence had been presented that Doctors Bretza, Rauter, or Allen had consulted the medical records and reports from previous surgeries performed on Mrs. Haley. Also, the court found that the examining physicians (Bretza, Rauter, and Allen) did not inform Mrs. Haley as to the risks of surgery and the alternatives to surgery. The trial judge concluded as a matter of law that the physicians who treated Mrs. Haley in October 1977 did not comply with the standard of care ordinarily exercised in the same or similar communities because they failed to consult the previous records and reports relating to the earlier hospitalizations and surgeries, failed to seek or advise Mrs. Haley of the availability of the specialized knowledge of a gastroenterologist, and failed to adequately inform Mrs. Haley of the potential complications from surgery and the alternatives to surgery. Moreover, the court held that the doctrine of informed consent existed in Oklahoma in 1977. The court entered judgment against the United States for $150,000 in damages for Mrs. Haley and $40,000 for Mr. Haley's loss of services and consortium. We affirm.

I

Defendant argues that the trial court committed clear error in finding that (1) the

doctors treating Mrs. Haley did not consult the medical records and reports pertaining to prior surgical procedures; (2) the precise diagnosis of the disease was necessary to justify surgical intervention; and (3) the physicians did not explain the risks of surgery to Mrs. Haley nor did they adequately inform her about potential wound infection or the circumstances under which they would remove her uterus. We disagree.

■ On the first issue, Dr. Bretza admitted that he was confused about Mrs. Haley's condition and that he was not sure whether he reviewed Mrs. Haley's records from the Oklahoma Osteopathic Hospital. Dr. Allen stated that he did not seek the Osteopathic Hospital records. Dr. Hrdlicka testified that he would not have performed the surgery had he known that the correct diagnosis was Crohn's disease, that he did not review the medical records, and that he relied on others to get consent for the hysterectomy. Although some evidence exists to support a finding that these doctors did consult records concerning Mrs. Haley's medical history, we cannot say that the trial court clearly erred in finding that the doctors had not adequately consulted Mrs. Haley's prior medical records and reports.

■ On the second issue, substantial evidence was presented at trial that it made a great deal of difference whether the diagnosis of Mrs. Haley's condition was Crohn's disease or ulcerative colitis. Three doctors testified that ulcerative colitis carries with it a much greater risk of cancer than Crohn's disease. Dr. James Reynard stated that surgeons should avoid operating on a patient with Crohn's disease absent life threatening complications. Dr. Leon Yoder testified that an erroneous diagnosis created unwarranted and unnecessary problems for Mrs. Haley. Because surgery is generally performed in cases of ulcerative colitis to eliminate the risk of cancer associated with that disease and surgery is generally avoided in cases of Crohn's disease because of the risk of post-surgical infection and

the efficacy of non-surgical therapeutic techniques, we cannot say that the trial court committed error in finding that a correct diagnosis of the disease was necessary for a patient to validly consent to a surgery.

■ On the third issue, the trial court correctly found that the physicians did not adequately inform Mrs. Haley about the potential for wound infection and the possible removal of her uterus. Neither hospital records nor Dr. Hrdlicka's records indicate that he saw Mrs. Haley the night before the operation. Dr. Allen testified that at the time of his October 21, 1977, visit with Mrs. Haley he had no intention of removing her uterus, that he did not inform Mrs. Haley that another doctor would perform the surgery, and that he did not tell her that an abnormally high risk of infection exists when a patient is operated on for Crohn's disease or ulcerative colitis. The government contends that because Mrs. Haley had undergone prior major surgery, she should have been aware of the potential for wound infection. However, each type of surgery creates its own peculiar risks. The trial court did not err in finding that a patient's previous surgeries do not relieve the physician from obtaining informed consent.

## II

■ The government argues that the doctrine of informed consent was not applicable in Oklahoma until November 28, 1979, when the Supreme Court of Oklahoma decided *Scott v. Bradford*, 606 P.2d 554 (Okla.1979).[1] There the court stated,

"Until today, Oklahoma has not officially adopted this [informed consent] doctrine. In *Martin v. Stratton*, 515 P.2d 1366 (Okl.1973), this Court discussed a physician's duty in this area but reversed the trial court on other grounds. It impliedly approved the doc-

1. The cause of action in this case arose in Oklahoma. Since the liability of the United States under the Federal Tort Claims Act is determined in accordance with state law, the substantive law of Oklahoma applies in this case. *Castillo v. United States*, 552 F.2d 1385, 1388 (10th Cir. 1977).

trine and stated its basic principles but left its adoption until a later time."

*Id.* at 557. In *Martin v. Stratton,* the Supreme Court of Oklahoma summarized the history of informed consent and endorsed one of two possible rules for application in informed consent cases:

"The majority rule appears to be that a doctor has a duty to reveal only information which would be disclosed by a doctor of good standing within the medical community of which the doctor is a member, and plaintiff has the burden of establishing the standard and establishing defendant violated the standard. . . .

Other cases indicate disclosure of all material risks is required, material risks being determined by the seriousness of the consequence, the probability of occurrence and the feasibility of alternatives .·. . . [P]laintiff has the burden of establishing materiality, but once materiality is shown disclosure is required, subject to certain exceptions, regardless of the custom of physicians in the locality."

515 P.2d at 1369 (citations omitted). We must determine what the Oklahoma Supreme Court meant in *Scott* when it stated that *Martin* "impliedly approved the doctrine and stated its basic principles but left its adoption until a later time." 606 P.2d at 557. Our conclusion is that the Oklahoma Supreme Court recognized the doctrine of informed consent in *Martin,* but there left to a future case the choice between the two rules of informed consent because plaintiff's evidence in the case was clearly insufficient under either theory. 515 P.2d at 1370. *See Lambert v. Park,* 597 F.2d 236 (10th Cir.1979). Thus, we agree with the trial court that although Oklahoma did not adopt the "material risks" standard until 1979, Mrs. Haley could prevail if as a matter of law she did not give her informed consent to the rectal surgery or to the hysterectomy under either of the standards enunciated in *Martin.*

### III

Under the "material risks" standard adopted by *Scott,* in a medical malpractice action the plaintiff must allege and prove:

"1) defendant physician failed to inform him adequately of a material risk before securing his consent to the proposed treatment;

2) if he had been informed of the risks he would not have consented to the treatment;

3) the adverse consequences that were not made known did in fact occur and he was injured as a result of submitting to the treatment."

606 P.2d at 559.

■ Under this test Mrs. Haley clearly prevails. The record supports the trial judge's conclusion that plaintiff proved the second and third prongs of this test. As to the first prong, the evidence in the record indicates that Mrs. Haley was not informed of the serious risk of infection following surgery for removal of the rectum. She was misinformed about the removal of the uterus. Assuming that Mrs. Haley's consent on the morning of surgery was valid, that consent was only for removal of her uterus if it was diseased. The trial judge found that Dr. Hrdlicka removed Mrs. Haley's uterus for "technical reasons," that is, to expose the rectal area. Finally, neither Dr. Hrdlicka nor Dr. Allen adequately disclosed their uncertainty about whether Mrs. Haley had Crohn's disease or ulcerative colitis. Dr. Jay Katz, the leading authority on the doctrine of informed consent, has written,

"All professions possess esoteric knowledge that, in its totality, is difficult to learn, understand, and master. Indeed, the complexity of professional knowledge commands the laity to listen carefully to experts. It does not necessarily suggest, however, that this knowledge cannot be communicated to, or understood by, patients. Nor does it suggest that professionals should decide how to proceed without consulting patients, particularly if alternatives are available and treatment is beset by much uncertainty. These considerations become even more relevant if it is also correct, as I believe it is, that physicians have during this century acquired a greater capacity than they had hereto-

fore to make distinctions between what they know, do not know, and what is as yet unknowable; that they have acquired the capacity, paradoxical as it may sound, to talk more knowledgeably about their ignorance."

J. Katz, *The Silent World of Doctor and Patient* 92 (1984). For Mrs. Haley to appreciate the risks associated with rectal surgery she had to be apprised that the doctors were only speculating about the possibility of cancer. Dr. Hrdlicka testified that had he known that Mrs. Haley had Crohn's disease he would not have performed the surgery. Dr. Reynard testified,

> "Well, ulcerative colitis, your mind associates ulcerative colitis with cancer. If you develop ulcerative colitis in childhood and it's a very severe form that involves the entire colon, the risk of cancer increases ten percent with every decade. And approximately 40 to 50 percent, after 30 years of ulcerative colitis will develop cancer."

R. IV, 195–96. Dr. Reynard also stated that Crohn's disease carries an increased risk of cancer but that the increased risk is so slight that gastroenterologists do not consider it significant. Under these circumstances, Dr. Reynard concluded that Mrs. Haley

> "underwent a very extensive life-threatening surgery for non-specific inflammatory bowel disease, which had been previously diagnosed to have an etiology consistent with Crohn's disease. And then, post-operatively, she developed numerous infections, I believe—wound infections—both abdominal and perineal. They had to be opened. She could have died from sepsis as a complication from that. Her abdominal wounds could have dehisced. You can name a whole list of horror stories that could have happened to her. I just think that the surgery was not indicated from the data that is available."

R. IV, 204–05.

### IV

█ The other informed consent test discussed in *Martin* requires that a doctor reveal information concerning medical and surgical procedures that would be disclosed by a doctor of good standing within the medical community of which the doctor is a member. 515 P.2d at 1369. The government argues that prevailing medical practice standards in Claremore, Oklahoma, did not require the doctors to disclose to Mrs. Haley the advisability of seeking the specialized knowledge of a gastroenterologist. The trial court cited *Runyon v. Reid*, 510 P.2d 943 (Okla.1973), for the proposition that physicians in Oklahoma have a duty to refer a patient to a specialist. But *Runyon* actually held, "A medical specialist owes a duty to his patient to exercise the degree of skill ordinarily employed under similar circumstances by similar specialist [sic] in the field in the same or similar communities." *Id.* at 950. Nevertheless, we agree with the trial court that if faced with the question of the duty of a physician to refer patients to a specialist, the Oklahoma Supreme Court would hold a physician does have such a duty when the patient suffers from a malady within the particular knowledge and training of a specialist. The Claremore doctors here had a duty to advise Mrs. Haley that the specialized knowledge of a gastroenterologist could aid in obtaining a more accurate diagnosis. When asked his opinion whether the care rendered Mrs. Haley comported with the standard of care in Tulsa in 1977, Dr. Reynard testified,

> "No. I think it falls short in the fact that in 1977, when she was seen, they were obviously confused about the diagnosis. The chart goes back from ulcerative colitis to Crohn's disease to, slash, 'I don't know what it is.' I think the first thing that should have been done by any standard or any normal practicing physician is to have her initial slides reviewed to see if that could help resolve the problem. You don't ask the patient what kind of disease they have. Frequently, patients are confused and they don't know if they have cancer or inflammatory bowel disease or what. So I think the slides should have been reviewed and I

think she should have been consulted by a gastroenterologist...."

R. IV, 200–01. We find no error in the trial court's conclusion that the physicians in this case did not conform their disclosures to the prevailing standard in the community.

AFFIRMED.